**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | | |
| | ) | | |
| **v.** | ) | **No.** | **1:22-mj-76 (GMH)** |
| | ) | | |
| **ARIAN TAHERZADEH &** | ) | | |
| **HAIDER ALI,** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION

For years, Defendants Arian Taherzadeh and Haider Ali portrayed themselves as federal law enforcement agents involved in covert operations on behalf of the Department of Homeland Security (DHS).  They are not law enforcement agents, and they are not involved in sanctioned covert activities.  Neither Defendant is even employed by the United States government.  But their impersonation scheme was sufficiently realistic to convince other government employees, including law enforcement agents, of their false identities.  They pretended to recruit other individuals to law enforcement and their fake operation—including shooting a person with an air gun—and leveraged their phony law enforcement status to ingratiate themselves to other law enforcement agents in sensitive positions.  They compromised United States Secret Service (USSS) personnel involved in protective details and with access to the White House complex by lavishing gifts upon them, including rent-free living.  And they procured, stored, and used all the tools of law enforcement and covert tradecraft: weaponry, including firearms, scopes, and brass knuckles; surveillance equipment, including a drone, antennae, hard drives, and hard drive copying equipment; tools to manufacture identities, including a machine to create Personal Identification Verification (PIV) cards and passport photographs; and tactical gear, including vests, gas masks, breach equipment, police lights, and various law enforcement insignia.

The Defendants should be detained pending trial on their impersonation scheme.  Both Defendants pose a danger to the community based on their use and possession of firearms and other weaponry in furtherance of their impersonation of federal law enforcement officers.  *See* 18 U.S.C. § 3142(f)(1)(E).  Furthermore, Ali's overseas travel to the Middle East, coupled with his claim to one witness that he has a connection to the Pakistani foreign intelligence service, establish that he poses a serious risk of risk of flight, *see* 18 U.S.C. § 3142(f)(2)(A); and Taherzadeh's efforts to destroy evidence of his involvement in the impersonation scheme after realizing he was under investigation establishes that he poses a serious risk of obstructing justice, *see* 18 U.S.C. § 3142(f)(2)(B).  For those reasons, as elaborated below and will be elaborated at the detention hearing this afternoon, the government's detention motion should be granted.

## I.      Procedural Background

On April 5, 2022, Taherzadeh and Ali were charged by criminal complaint with False Impersonation of a Federal Officer, in violation of 18 U.S.C. § 912 and the Court issued warrants for their arrest.  The Defendants were arrested on April 6 and made their initial appearance on April 7.  The Court scheduled a detention hearing for today, April 8, at 3:30pm.

## II.      Factual Background

The Court is aware of the relevant facts as set forth in the criminal complaint and affidavit (D.E. 1).  The Government adopts those facts for purposes of this memo.  The additional facts set forth below are part of the Government's ongoing investigation, which began less than two weeks ago.

### Search Warrant

On April 6, 2022, subsequent to the criminal complaint and issuance of the arrest warrants, law enforcement executed a search warrant at an apartment complex in Southeast Washington,

D.C., where the Defendants resided and held multiple apartments: (1) Penthouse 5; (2) Apartment 708; (3) Apartment 608; (4) Apartment 509; and (5) Apartment 1361.  Evidence recovered during the search of Penthouse 5, Apartment 608, and Apartment 509 as well as voluntary post-arrest statements by Taherzadeh, revealed significant facts relevant to the pretrial detention of the Defendants.

**Penthouse 5**

Law enforcement's investigation has established that Penthouse 5 was maintained and controlled by Taherzadeh and Ali, and currently used for the operation of "U.S. Special Police LLC" (USSP), Taherzadeh's company, and storage of relevant equipment and paperwork.  During the execution of the warrant, numerous items of evidentiary value were recovered.  For instance, firearms and ammunition were seized.  Specifically, a Glock 19 9mm handgun loaded with 17 rounds of ammunition, including one in the chamber, seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition, as depicted in the photographs below.





Taherzadeh told law enforcement that the Glock 19 belongs to Ali, but admitted that he has also possessed it.  This is consistent with law enforcement records, which show that on or about November 18, 2020, Ali purchased a Glock 19 and, the next day, applied for a Firearms Registration Certificate with MPD.  Taherzadeh's admission that he also possessed the Glock 19 is consistent with three witnesses who observed Taherzadeh illegally carrying a Glock 19 in a concealed and manner.

Law enforcement also seized firearm components typically used with long guns or assault rifles including, among other things: (1) a firearm barrel of an unknown caliber; (2) weapon stock attachments[1]; (3) foregrips[2]; (4) pistol grips; (5) a magazine cartridge; and (5) scope(s).  In addition, law enforcement recovered a spotting scope, which can be used in a sniper/spotter team.

---

[1] A weapon stock is a part of a long gun that provides structural support, to which the barrel, action, and firing mechanism are attached.

[2] A foregrip is a vertical pistol grip mounted on the fore-end of a long-barrel firearm, designed for grasping by the frontal support hand (or "off hand").



In addition, the Government discovered multiple firearms safes.



Law enforcement also seized an Airsoft pistol and brass knuckles.



Law enforcement recovered numerous electronic devices including, among other things: (1) a significant quantity of surveillance equipment; (2) approximately 30 hard drives; (3) hard drive copying equipment; (4) a computer server containing six modules; (5) a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips; (6) a currency counter; (7) several Subscriber Identification Modules (SIM) cards; and (8) antennas.



Law enforcement also recovered tactical gear and storage equipment, clothing with police insignias, police parking placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe.



With respect to documents, law enforcement seized, among other things: (1) a binder containing a list of residents, apartment numbers, and contact information; (2) a DHS Procedures Manual: (3) a Federal Law Enforcement Training Center (FLETC) Manual; (4) Law Enforcement Use Only documents; (5) immigration documents for a number of individuals[3]; (6) a box of

---

[3] Law enforcement has not verified the identities of these individuals or their connection to the Defendants.

documents with profiles of individual people[4];  (7) passport photos of what appears to be Ali; (8)

USSP documents; and (9) miscellaneous mail and documents associated with Taherzadeh and Ali.



---

[4] Law enforcement has not yet verified the identities of these individuals or whether the Defendants had law authority to possess the information.



        In one document, an invoice for the Defendants' Chevrolet Impala, the customer

information is listed as "Secret Service US" with fake and fictious names, such as the "authorizer

name" listed as "Fay Tate" and the "driver name" listed as "James Haider," an obvious variation

on Haider Ali.



**Apartment 708**

Law enforcement's investigation has established that Apartment 708 was maintained and controlled by Taherzadeh.  During voluntary post-arrest interview, Taherzadeh stated that this apartment was his residence.  During the execution of the warrant, numerous items of evidentiary

value were recovered. For instance, firearms and ammunition were seized. Specifically, law enforcement seized a Sig Sauer P229 with fives fully loaded magazines, containing a total of 61 rounds. Under Title 18, United States Code Section 922(g)(9), Taherzadeh is prohibited from possessing a firearm or even single round of ammunition because of his prior conviction for a misdemeanor crime of domestic violence.[5]



In a voluntary post-arrest interview, Taherzadeh admitted that he owned and possessed the firearm. This is consistent with records from MPD indicating that Taherzadeh registered the Sig Sauer P229 on November 16, 2018.

Law enforcement also discovered two firearms safes in Taherzadeh's residence. A large firearm safe containing an Airsoft rifle with a scope, the Sig Sauer handgun and magazine

---

[5] On September 2, 2013, in the Arlington Juvenile and Domestic Relations District Court for Seventeenth Judicial District (Docket Number A-23808-01-V), Taherzadeh pled guilty to Misdemeanor Assault and Battery on Family Member. According to court documents, the victim of the assault was TAHERZADEH's wife. TAHERZADEH was sentenced on October 13, 2013.

described above as well as two boxes of handgun ammunition containing a total of 68 rounds of ammunition.





In another firearms safe, law enforcement recovered two Airsoft pistols and holsters.



In addition, law enforcement seized a significant quantity of Airsoft ammunition.



Law enforcement also recovered a rifle scope, tactical gear and storage equipment, clothing and patches with police insignias, handheld radios, a high-end drone, a gas mask, handcuffs, zip ties, breaching equipment, a cleaning kit for firearms, an ultraviolet flashlight, an RF-GS k18 which is used to locate hidden cameras, microphones and RF transmitters (e.g. vehicle trackers),

computer server with two modules, an encrypted portable hard drive, antennas, and a firearms holster mounted and hidden under a desk.





Law enforcement also recovered three current copies of Taherzadeh's Washington D.C. driver's license, passport, United States Special Police – Special Investigations Unit business cards, a USSP police badge, and several identification and credit cards.   In addition, law enforcement recovered the business card of a USSS Agent referenced in the complaint affidavit. Notably, Taherzadeh's business card is formatted very similarly to the USSS business card.



**Apartment 608**

Law enforcement's investigation has established that Apartment 608 was maintained and controlled by Ali.  Within that apartment law enforcement seized laptops, flash drives, a USSP badge, and police lights that can be installed in a vehicle.

**Apartment 509**

Law enforcement's investigation has established that Apartment 509 was maintained and controlled by Resident 1, who had been given use of the apartment of Taherzadeh.  Within that apartment, law enforcement seized surveillance equipment, handcuffs, mail for Apartment 608, occupied by Ali, and a key to apartment 708, occupied by Taherzadeh.

<div align="center">

**Travel Records**

</div>

With respect to Ali, law enforcement recovered two passports, the first of which expired in June of 2020 and a second, issued in October of 2020 with an expiration date in October of 2030.

Ali's expired passport contained several visas authorizing foreign travel.  For instance, this passport contained two visas authorizing travel from the Islamic Republic of Iran.  The first visa that allowed entry July 31, 2019 through October 28, 2019  and  second visa that allowed entry from October 28, 2019 through January 25, 2020.  The Government has identified at least four entry/exit stamps from Mashhad International Airport in Mashhad, Razavi Khorasan, Iran.



Ali's passport also contained a visa and entry/exit stamps from Iraq in May of 2019.



In addition, the Ali's passport contained two thirty-day visas from Pakistan and one visa for travel to Egypt.



In addition, United States Customs and Border Protection records indcate that Ali traveled: (1) through/to Doha, Qatar[6] in November of 2016 and returned approximately 13 days later; (2) through/to Doha, Qatar in May of 2019 and returned approximately 12 days later[7]; (3) through/to Doha, Qatar in July of 2019 and returned approximately 6 days later;  (4) through/to Doha, Qatar in October of 2019 and returned approximately 9 days later, departing from Istanbul, Turkey.[8]

## Additional Evidence

Law enforcement has obtained two videos of Taherzadeh shooting a handgun and assault rifle at a shooting range believed to be in Northern Virginia. In one video, Taherzadeh appears to be wearing a long sleeve shirt with a USSS insignia on the arm.  Again, Taherzadeh is prohibited from possessing either of these weapons and the ammunition contained within them.

---

[6] Doha International Airport is a major hub frequently used to connect to locations throughout the middle east.

[7] This time period corresponds to the entry and exit stamps in Iraq.

[8] As the Court is aware, the Covid-19 global pandemic started in approximately January/February 2020, which may explain why there has not been more recent travel.



Subquent to his arrest, and as referenced above, Taherzadeh was voluntarily interviewed by law enforcement. During he course of this interview, Taherzadeh admitted, among other things, that: (1) he had falsely identified himself as a member of the Department of Homeland Security; (2) he had falsely identified himself as a former United States Army Ranger; (3) the Sig Sauer 229 firearm belonged to him and was in his possession; (4) the Glock 19 firearm belonged to Ali, but Taherzadeh had possessed it as well; (5) he offered to provide a USSS agent with an assault rifle; (6) he provided free apartments to two USSS agents for approximately one year; (7) he had provided a "doomsday bag," generator, flat screen television, two iPhones, a drone, a gun locker, a Pelican case, and a mattress to agents and officers of the USSS; (8) he did in fact shoot someone, identified in the complaint as Witness 1, with an Airsoft gun.[9]; and (9) subsequent to Ali representing to the Postal Inspector that that Taherzadeh and Ali were part of DHS and then being questioned by the inspector, Taherzadeh began deleting law enforcement related material from his

---

[9] Taherzadeh claimed that this was not part of the DHS recruitment process and that he allowed the individual to shoot him as well with the Airsoft rifle.

social media.  With respect to Ali, Taherzadeh stated that Ali had obtained the electronic access codes and a list of all of the tenants in the apartment complex.  Taherzadeh further stated that Ali was the individual that funded most of their day-to-day operation but Taherzadeh did not know the source of the funds.

III.   **Argument**

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance . . . ; (2) released on a condition or a combination of conditions . . . ; or (4) detained under subsection (e)."  Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)."  *Id.* at § 3142(e).  The evidence outlined above makes plain that Taherzadeh and Ali should be detained pending trial.

A.  **Bases for Detention Request**

According to Section 3142(f), there are limited circumstances in which the Court "shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003).  Here, as to Taherzadeh and Ali, subsection (f)(1)(E) applies because this is a case that involves the possession or use of a firearm, destructive device, or any other dangerous weapon. As to Ali, subsection (f)(2)(A) applies because this is a case that involves a serious risk of flight. As to Taherzadeh subsection (f)(2)(B) applies because this is a case that involves a serious risk that the defendant will obstruct or attempt to obstruct justice.  These bases for a detention hearing are supported by the evidence outlined above.

*First*, this case involves the possession and use of firearms.   Section 3142(f)(1)(E) mandates a detention hearing in connection with "any felony" if the Government proves by a preponderance of the evidence that the charged felony "involves the possession or use of a firearm or destructive device[.]"  In determining whether the charged felony "involves the possession or use of a firearm," "we may consider the actual conduct at issue in the specific case," and not just whether the elements of the charged offenses required the possession or use of a firearm.  *United States v. Watkins,* 940 F.3d 152, 166 (2d Cir. 2019).   Here, in furtherance of their efforts to falsely impersonate federal law enforcement officers, firearms played a critical role.  Taherzadeh and Ali possessed and carried firearms consistent with those used by law enforcement, namely a Sig Sauer pistol, owned by Taherzadeh, and then a Glock 19 pistol, owned by Ali.  Indeed, as set forth in the complaint affidavit, a law enforcement witness told Taherzadeh that the USSS was transitioning from the Sig Sauer 229 to the Glock 19.   After being alerted of this change in weaponry, Taherzadeh saw this witness again and remarked that "we are all transitioning to the Glock 19s in DHS" and pulled Ali's Glock 19 from a concealed holster.  The fact that Taherzadeh and Ali changed the firearm they possessed and carried in order to be consistent with federal law enforcement is strong evidence of the role that firearms played in this offense. In addition, three witnesses have observed Taherzadeh carrying a firearm both concealed and overt. Indeed, law enforcement seized two firearms in this case, dozens of rounds of ammunition, as well as parts used to modify long guns and assault rifles.   Accordingly, this case involves the possession and use of firearms, and Section 3142(f)(1)(E) is an appropriate basis for a detention hearing.[10]

---

[10] Although not a "firearm" as defined in Title 18, United States Code, 921(a)(3), Taherzadeh shot an individual with an Airsoft pistol, with Ali present, under the guise that this was a part of the DHS recruiting process.  This conduct displays a reckless disregard for safety and potential risk of harm to members of the community.

*Second*, with respect to Ali, this case also involves a serious risk of flight as defined in Title 18, United States Code, Section 3142(f)(2)(A).  Ali is facing potential conviction on a serious felony offense that carries statutory maximum penalty of three years' incarceration.  Ali has also made at least three trips to abroad since 2019 and possesses a valid passport.  Significantly, Ali obtained two 90-day visas from Iran and traveled there twice, not long before the charged activity began as early as February 2020.  Should Ali flee to Iran, the United States would be unable to extradite him back as there is not currently an extradition treaty between the United States and Iran.  Further, Ali's passport contained three third-day visas from Pakistan indicating that he has some contacts in that country, he places of birth.  However, it critical that the Court consider that, although not confirmed by the United States Government, Ali has stated to at least one witness that he has ties to the Inter-Services Intelligence, the intelligence agency of Pakistan.  Until this claim can be further investigated, and given the nature of Ali's conduct, specifically impersonating federal law enforcement in order to ingratiate himself with and infiltrate networks of federal law enforcement officers and other federal employees, his claim must be taken literally and seriously.  Without fully understanding the full scope of Ali's conduct, including all of the federal employees that he may have had contact with and compromised, Ali's flight from justice could cause significant damage to our national security.  Indeed, should Ali's claim be true, he would have significant reason to flee and seek the protection of a "friendly" government.  These factors all combine to give Ali the incentive and a potential means to attempt flee and to evade prosecution.

Finally, with respect to Taherzadeh, this case also involves a risk of tampering with witnesses and evidence.  As described above, shortly after the USPIS Inspector began his investigation and questioned Taherzadeh regarding his criminal conduct falsely impersonating a DHS officer, Taherzadeh, by his own admission, began deleting his social media posts related to

law enforcement.  In addition, more recently, Taherzadeh was recently, inadvertently made aware that a federal law enforcement investigation was underway.  There is evidence that after this inadvertent notification, Taherzadeh turned off the location services feature and GPS on his iPhone, which prevented the USSS agents to whom he provided iPhones from knowing his location and, therefore, assisting law enforcement.[11]  The Government is also concerned that should the Court allow Taherzadeh  to return to his current residence(s) and given that several witnesses already interviewed live at that address and other witnesses continue to come forward, his presence could create the risk of witness tampering or intimidation, particularly given knowledge of his prior possession of firearms.

Under any of these bases—firearms, flight, and tampering—as applied to the relevant defendant, detention pending trial is necessary to protect the community, ensure both defendants return to court, and safeguard the integrity of evidence and the proceedings.

## B.  Analysis

The Court must consider four factors to determine whether pretrial detention is warranted and necessary: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  The persuasion burden rests with the government.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  A judicial officer's finding of dangerousness must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f); *Stone*, 608 F.3d at 945.  When "risk of flight" is

---

[11] Although the Government is not moving to detain Taherzadeh based on risk of flight, this act does create some concern about flight, but the other two bases for detention are more compelling and, with at least with respect to Taherzadeh, his risk of flight could be mitigated.

the basis for detention, however, the government must only satisfy a preponderance of the evidence standard. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). An analysis of these four factors weighs heavily in favor of Taherzadeh and Ali's detention given the clear and convincing evidence that their release presents a particular danger to the community as well as the preponderance of evidence that Ali poses a serious risk of flight and that Taherzadeh poses a risk of obstructing justice.

### i. Taherzadeh and Ali's Criminal Involvement was Serious

The Defendants were not merely playing dress-up; they had firearms, they had ammunition, they had body armor, they had tactical gear, they had surveillance equipment, and they were engaged in conduct that represented a serious threat to the community, compromised the operations of a federal law enforcement agency, and created a potential risk to national security. *See United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) ("[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'") (citing *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).

*First*, the Defendant's created a public safety risk. As described in greater detail above and in the complaint affidavit, a key component of the Defendants conduct was the possession of firearms and law enforcement equipment, creating a risk of physical harm. Indeed, in at least one instance with firing a weapon at a person. Specifically, the Defendants were involved in shooting an individual, who believed they were an applicant for a DHS job, with an Airsoft gun. *Second*,

the Defendants improperly gained access to tenant information—many of whom were law enforcement and federal employees—creating a privacy intrusion, and physical access to their apartments, creating a safety risk.   *Third*, in compromising at least four members of the USSS, they caused a risk to national security and the functioning of an essential government agency protecting the nation's leadership.   Because of the nature and circumstances of the Defendants' conduct, this factor points in favor of detention.

### ii.   The Weight of Evidence Against Taherzadeh and Ali is Strong[12]

The weight of the evidence of dangerousness is immense.   As set forth above, the search warrant recovered: (1) a Glock 19 9mm firearm loaded with 16 rounds of ammunition in the magazine and an additional round in the chamber; (2) a Sig Sauer 229 firearm with five fully loaded magazines containing approximately 61 rounds of ammunition; (3) seven rounds of .308 caliber ammunition; (4) an ammunition box with over 35 rounds of handgun ammunition; (5) two additional boxes of handgun ammunition; (6) components for tactical modifications typically used on long guns and rifles, including a barrel, a cartridge, weapon stocks, grips, handles and scopes; (7) three Airsoft pistols; (8) an Airsoft rifle; (9) Airsoft ammunition; (10) a spotting scope; (11) handcuffs; (12) zip ties; (13) brass knuckles; (14) breaching tools and (15) surveillance equipment. By Taherzadeh's own admission he possessed these weapons and in some cases, possessed them jointly with Ali.

In addition, and as set forth the complaint affidavit, numerous law enforcement witnesses stated that Taherzadeh and Ali falsely impersonated federal law enforcement officers and

---

[12] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt."   *Stone*, 608 F.3d at 948 (citation omitted).

improperly obtained personal information of apartment residents and access codes to their apartments. Taherzadeh corroborated these statements during his interview with law enforcement.

Under these circumstances, only pretrial detention can protect the community from the danger Taherzadeh and Ali pose.

### iii.  History and Characteristics of Taherzadeh and Ali

These facts call into question Taherzadeh and Ali's willingness to comply with release conditions fashioned by this Court. Separate and apart from the criminal conduct in their False Impersonation of an Officer of the United States, the Defendants have demonstrated an inability to comply with law.

*First*, Taherzadeh is not permitted to possess a firearm. On July 6, 2013, he was arrested in Arlington County, Virginia and charged with one count of Strangulation Resulting in Wounding, a Class 6 Felony and one count of Assault and Battery on a Family Member a Class 1 Misdemeanor on the person of his wife, M.H. On September 2, 2013, in the Arlington Juvenile and Domestic Relations District Court for Seventeenth Judicial District (Docket Number A-23808-01-V), the Felony Strangulation charge was amended to Misdemeanor Assault and Battery on Family Member, to which Taherzadeh pled guilty. Taherzadeh also pled guilty to the second charge of Assault and Battery on a Family Member. On October 13, 2013, Taherzadeh was sentenced on the initial domestic violence charge to twelve (12) months in jail with eleven (11) months suspended conditioned upon: general good behavior; supervised probation; abuser's intervention program and follow all recommendations or domestic violence program ager management counseling pers probation officer; mental health evaluation and follow all recommendation[s]; pay restitution of medical expenses within 6 months; pay court costs. As a result of this misdemeanor

domestic violence conviction, pursuant to Title 18, United States Code, Section 922(g)(9) it is unlawful for Taherzadeh to possess a firearm or even a single round of ammunition.

It should also be noted that court records indicate that on September 5, 2013, prior to sentencing, Taherzadeh was arrested in Fairfax County and charged with Assault and Battery on a Family Member.   In this instance, the victim was Taherzadeh's girlfriend, not his wife.   On September 25, 2013, Taherzadeh was charged in Fairfax County with violating a protective order. This conduct evidences an inability to abide by the law and conditions that the Court may impose.

*Second,* on or about February 18, 2020, Taherzadeh applied for a concealed weapons permit and was denied due to his prior history of violence and instability.  An individual carrying a concealed weapon without a registration is in violation of Washington, D.C. firearms laws, specifically, D.C. Official Code § 22–4504.   Despite this rejection, according at least two witnesses, Taherzadeh carried a firearm in a concealed manner.

*Third,* when confronted by the USPIS Inspector in March 14, 2022, Ali and Taherzadeh provided false information.  Furthermore, documentary evidence shows that the Defendants have created false and fraudulent identities for purposes of signing documents, including the apartment leases.  Taherzadeh admitted during his voluntary post-arrest interview that he had in fact created a fictious identity to execute the apartment lease.  In addition, as highlighted above, Ali appears to have also used a false identity in connection with a service for the Chevrolet Impala at Jiffy Lube.

### iv.   Danger to the Community and Risk of Flight

Finally, for the reasons set forth above Taherzadeh and Ali are a danger to the community. In addition, Ali's relevant foreign travel, foreign contacts, and uncorroborated statement of a connection to a foreign intelligence service make him a significant flight risk.

IV.     <u>**Conclusion**</u>

As practiced liars who perpetrated a long-term deception – cooking up entirely fake personas and positions, elevating themselves with imagined pretensions to be above the law and above others – they cannot be trusted to return to court, to cease their efforts to obstruct the investigation, nor to not simply reassemble or use an arsenal similar to the one they built here.

For the reasons set forth above, Taherzadeh and Ali must be detained pending trial to protect the safety of the community, ensure both defendants return to court, and safeguard the integrity of evidence and the proceedings from Taherzadeh further destroying evidence and obstructing justice.

<div style="margin-left:50%">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By: */s/ Joshua S. Rothstein*
    Joshua S. Rothstein
    Assistant United States Attorney
    N.Y. Bar Number 4453759
    555 4th Street, N.W., Room 5828
    Washington, D.C. 20530
    Office: 202-252-7164
    Joshua.Rothstein@usdoj.gov

</div>