IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 1:22-mj-76 (GMH) |
| | ) |
| ARIAN TAHERZADEH & | ) |
| HAIDER ALI, | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF MOTION FOR DETENTION**

As the Government stated during Friday's detention hearing, with every new fact uncovered in the investigation of Defendants Arian Taherzadeh and Haider Ali, the story only gets worse. What we have learned in the 36 hours since that hearing is no exception. With respect to the Court's question about whether the Defendants conducted legitimate business as Special Police Officers (SPOs), the answer is a resounding no—in fact, the Defendants sought but were denied commissions to work as armed SPOs and, even if they had obtained such commissions, their activities far exceeded the scope of SPO authority. In addition, within the last day, the Government has confirmed more troubling facts: the ammunition magazines seized from Ali's Glock 19 and Taherzadeh's Sig Sauer were illegal, high-capacity magazines; and, after Taherzadeh was tipped off about the investigation, either he or Ali appears to have made further attempts to conceal evidence, including by trying to corruptly enlist the help of a federal law enforcement agent. Because of the breakneck pace of the investigation, there are many facts that we still do not know. But the facts that we do know about the Defendants—that they lied about their identities for years, stored a cache of weapons and surveillance equipment in their apartments, compromised law enforcement agents in sensitive positions, and tried to cover up their crimes—leave no doubt that their release poses a public safety risk. Both Defendants should be detained.

**1. The Defendants' Applications to the District of Columbia for Commissions to be Armed SPOs were Rejected.**

The Court inquired whether the Defendants had any legitimate reason to carry firearms as licensed SPOs. They did not. In fact, each of them applied for and was denied a commission to work as an armed SPO in the District of Columbia. Nonetheless, as detailed in the Complaint and the Government's Detention Motion, and elaborated more below, the Defendants presented themselves as armed law enforcement agents and possessed illegal weapons and ammunition. Even if they were licensed as SPOs, the Defendants' possession and use of weapons, ammunition, and other tools of law enforcement and covert tradecraft far exceed the scope of SPO licensure, further evidencing the lengths of their deception and demonstrating their dangerousness.

In the District of Columbia, SPOs are appointed by the mayor and must be commissioned under the District of Columbia Municipal Regulations. *See* D.C. Code § 5-129.02 (previously codified as D.C. Code § 4-114 (1981)); D.C.M.R. §§ 1100 (Appointment: General Provisions), 1101 (Appointment: Section 4-114 Appointments). Licenses are obtained by application to the Department of Consumer and Regulatory Affairs (DCRA), must be approved by MPD, and are restricted to a specific premise the SPO is authorized to guard or protect. *E.g.*, D.C.M.R. §§ 1100.7(d) (noting that commissions must be approved by the Chief of Police), 1101.3 (tying commissions to specific premises or companies with security responsibility over specific premises). According to MPD, Taherzadeh applied to be an armed SPO and was denied on March 18, 2019, due to his prior misdemeanor conviction for domestic violence. *See id.* § 1102.2 (prohibiting appointment as a SPO to any person convicted of a crime of violence). Taherzadeh subsequently reapplied, and was permitted to obtain a commission as an unarmed SPO. That commission expired when Taherzadeh did not provide supporting documents in support of relicensing in December 2021. Likewise, according to MPD, Ali applied for and was denied an

SPO commission in or around October 2020 based on his prior arrests for Assault of Family Member (2018) and Malicious Wounding & Abduction by Force (2009). In addition, according to MPD, neither Defendant has a license to carry a pistol outside of his residence. Nonetheless, according to witnesses, Taherzadeh regularly did, and a concealed carry holster for Ali's Glock recovered in the search of Penthouse 5 indicates that he did as well.

Even though neither Defendant was commissioned as an armed SPO, in July 2018, Taherzadeh registered a security company, "United States Special Police LLC," with the District of the Columbia. According to MPD, because that name risked confusing the LLC with federal law enforcement and conveying false authority, DCRA required Taherzadeh to change the name. He changed it to "USSP." USSP's license expired on October 31, 2021, and was not renewed. USSP has never had any firearms registered to it. USSP supplies neither Defendant with justification for their weaponry, their tactical and other gear identifying themselves as police or federal agents, or their false claims to be law enforcement agents.

The Government has also learned that Ali obtained a license as a private detective. *See* D.C.M.R. § 17-2000 (General Provisions; defining a "private detective" as any person engaged in the business of "revealing crime or criminals," "securing information for evidence relating to crime or criminals," or "revealing the identity, whereabouts, character, or actions of any person(s) or thing(s)"). But Ali does not appear to have held himself out or conducted any business as a private detective, and the applicable Municipal Regulations confer no authority on private detectives to carry weapons or convey law enforcement authority. Indeed, unlike with an SPO license, because "private detective" licensure does not confer special authority, it does not require special training. This appears only to be another effort by Ali to obtain some imprimatur of official authority for his deceitful scheme. Indeed, when confronted by a USPIS Inspector on March 16, 2022, Ali

falsely represented himself to be "an investigator with USSP Special Investigations Unit, part of DHS."

### 2. Even if the Defendants Were SPOs, Their Conduct Was Not Authorized.

Even if the Defendants were commissioned as SPOs, ran a legitimate security company, or were engaged in the business of a private detective, their activities far exceeded the scope of SPO authority and illustrates the danger posed by their masquerade. In the District of Columbia, "[t]he duties of special police officers . . . shall consist largely of periodically checking doors, windows, etc., in the nature of a 'watchman.'" D.C.M.R. § 1101.6; *see also* D.C.M.R. §§ 1103 (restricting SPOs' display of badges, weapons, and other evidence of authority to the premises they are commissioned to guard or protect, and directing that weapons shall remain only on those premises unless they cannot practically be stored there), 1109 (requiring SPOs to wear "distinctive uniforms" identifying them as "SPECIAL POLICE").

But these men did not confine themselves to periodically checking doors and windows. The Defendants equipped themselves to break down doors and windows and perform other armed law enforcement activities, amassing weapons, surveillance equipment, and breach tools. As an initial matter, Taherzadeh is prohibited from possessing a firearm or even one bullet by federal law—regardless of whether at home—because of his prior misdemeanor domestic violence conviction. But even if Taherzadeh were permitted to possess a firearm at all, SPOs must request and receive special authorization from MPD to carry a semiautomatic weapon, like Ali's Glock 19 or Taherzadeh's Sig Sauer 229. According to MPD records, neither Taherzadeh, Ali, nor USSP ever applied for or received such a waiver. Moreover, the Defendants represented themselves as being engaged in covert federal law enforcement operations and used that cover to gain the confidence of and to compromise federal law enforcement agents in sensitive positions—and they

4

worked together to accomplish this.  The Defendants could not present a clearer case of danger to the community.[1]

In addition, Special Police officers are "strictly confined in their authority to the particular place or property which they are commissioned to protect." *Id.* at 1100.2.  Further, they are prohibited from even "displaying a badge, weapon, or other evidence of authority in any other place than the property of, or under the charge of, the corporation or individual upon whose account he or she is appointed." *Id.* at 1103.1.  In other words, there would be no legitimate purpose for Taherzadeh to walk around displaying a badge or a weapon, unless at a property he was assigned to protect—and to be clear, Taherzadeh was not authorized or assigned to use a weapon to protect any property, nor has the Government uncovered any evidence that Taherzadeh did work as an unarmed SPO.  This is consistent with the purpose of these regulations: to prevent Special Police officers from exercising their authority or for the public to perceive them to be exercising their authority at any place other than property they are assigned to protect.

The D.C. government is so concerned about the public's perception of a Special Police Officer's authority that even the markings on their clothing are regulated.  Specifically, they can only wear patches and clothing that make clear that they are Special Police—not MPD or other official law enforcement.  The regulations require that while on duty they wear a "distinctive shoulder patch… that must be circular in shape and at least five inches (5") in diameter and carry thereon in two (2) lines in suitable contrasting colors the words "SPECIAL POLICE" in letters not less than one-half inch (1/2") high in the center of the circle, together with the name or abbreviation of the employer of that special officer."  In other words, an SPO cannot wear clothing or patches

---

[1] The Government has also received alarming information from other witnesses, including a Naval Intelligence Officer to whom Taherzadeh misrepresented himself as an HSI agent. The Intelligence Officer was so alarmed and concerned about Taherzadeh's attempt to gather information that he reported the contact to the Naval Criminal Investigative Services.

to indicate that they are MPD, a Special Agent, part of the Crisis Response Team (CRT), Special Weapons and Tactics Team (SWAT), Special Investigations Unit, or anything similar. The items seized from the Defendants served the opposite purpose. Their markings were intended to mislead and deceive people into believing they were something they were not and had authority they did not possess.



In addition, law enforcement also seized a dynamic entry kit from Penthouse 5 which included a mini-door ram, axe, sledgehammer, Halligan tool, and bolt cutters. MPD has confirmed that not only are these items inconsistent with the responsibilities of "watchman," but this type of equipment is generally issued only to select MPD officers.



Finally, the Government notes that the fact that the Defendants worked together made their scheme more credible, and makes each Defendant more dangerous. Each Defendant did what he could to obtain some sort of armed law enforcement authority, but was denied. Undeterred, the Defendants worked together to nonetheless take on all of the trappings of an armed law enforcement officer and falsely represent themselves and each other as armed law enforcement. According to witnesses, the Defendants' scheme was effective in part because each of them vouched for the false identity and authority of the other.

**3. The Defendants Were in Possession of Illegal Firearm Magazines.**

During the execution of the search warrant, law enforcement recovered illegal high-capacity magazines for both Taherzadeh's Sig Sauer 229 and Ali's Glock 19. Under D.C. law, it is illegal "to possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm." D.C Code § 7–2506.01 (b). A "large capacity ammunition feeding device" means "a magazine…that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." Law enforcement seized five 12-round magazines from Taherzadeh's apartment for his 229 Sig Sauer and one 15-round magazine from Penthouse 5 for Ali's Glock 19. There is no lawful purpose for possessing these large capacity magazines and it is inconsistent with the duties and responsibilities of a Special Police officer or a private detective.

In addition, the Government has just interviewed a witness—a former United States Marine—whom Taherzadeh and Ali attempted to recruit and deputize for what they claimed were DHS operations. According to the witness, in Taherzadeh and Ali's presence, he observed illegal weapons, including an AR-15/M4 variant automatic rifle with an illegal suppressor which had also

been modified to be an illegal automatic weapon, and an AR Pistol with a modified brace consistent with the firearm parts recovered during the execution of the search warrant.

   **4. After Taherzadeh was Tipped Off, He and/or Ali Appear to Have Attempted to Conceal Evidence.**

At some point after Taherzadeh was informed of the Government's investigation last Tuesday, it appears that he and/or Ali tried to conceal evidence of their crimes by shipping it out of their apartment complex.

During the execution of the search warrant, in Penthouse 5, law enforcement discovered shipping materials and UPS labels which raised concern that evidence was being secreted from the premises. These concerns proved true. On Thursday, April 7, 2022, a USSS Uniformed Division Officer referenced in the complaint and assigned to the White House, Witness 3, received a package sent via UPS Next Day Air. The return address on the label was "USSP" and corresponded to Ali and Taherzadeh's apartment complex. Within this box were additional smaller boxes which each hid Sig Sauer and Glock firearm cases—the kind of case in which a firearm is sold—but that do not correspond to any of the firearms seized during the search warrant. These cases corresponded to apparent purchases of a P365 9MM Sig Sauer, a P365 XL 9MM Sig Sauer 9MM , and a Glock 19 Generation 4 9MM.



In addition, the firearm case for the P365 Sig Sauer 9MM contained three ammunition magazines, one of which appears to be a high-capacity magazine.



Notably, at the time that these items were shipped, the Government was conducting constant surveillance of the Defendants and their apartment building, which they almost never left. The Government believes that the Defendants may have been aware of this surveillance and thus, that shipping the evidence was their attempt to remove evidence without the Government's detection.

The package also contained a cigar case with four cigars. This is consistent with the prior pattern and practice of providing federal law enforcement agents with gifts and items of value, and suggests that Taherzadeh and/or Ali shipped the package to the USSS Uniformed Division Officer in an attempt to corruptly enlist him in secreting evidence.



**Conclusion**

Arian Taherzadeh and Haider Ali were not legitimate law enforcement of any kind. Yet they possessed illegal firearms and ammunition; fraudulent badges and other law enforcement identification; and surveillance and forced entry tools. When tipped off to this investigation, they attempted to hide evidence of their conduct. Each hour since their arrest, the Government learns more—and scarier—information about how Taherzadeh and Ali abused their fake authority. But the Court has sufficient facts before it now to determine that their release would endanger the community and risk their flight from justice and obstruction of critical evidence.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: */s/ Joshua S. Rothstein*
Joshua S. Rothstein
Assistant United States Attorney
N.Y. Bar Number 4453759
555 4th Street, N.W., Room 5828
Washington, D.C. 20530
Office: 202-252-7164
Joshua.Rothstein@usdoj.gov